Good morning, Your Honors. May it please the Court, Benjamin Schatz of Manat, Phelps & Phillips for Appellant ISS. To win monetary damages under Arizona's Trade Secret Act, the plaintiff has to demonstrate four things. They have to show misappropriation of a trade secret, use or disclosure of a trade secret, causation of harm from that use, and an amount of dollars attributable to that harm caused by that use. And all four of those elements are missing in this case. And I'd like to particularly focus on the last two, the causation and the quantification of damages. But for the first two, I'll simply note that METI engages in sort of a moving target game about what the trade secrets were in this case. Our briefing outlines why many of those items really aren't trade secrets. But it becomes very difficult to pinpoint and connect the dots between what the alleged trade secrets are, how they were supposedly used or disclosed, and then how that use or disclosure caused any sort of misappropriation is an intentional tort. It's not a strict liability tort. And this means that there has to be causation of harm. Causation is that necessary link between the misappropriation and the damages. And trade secret law, like all tort law, is supposed to be compensatory. It's not supposed to be punitive. And this is where METI's criminal law analogy breaks down, because METI argues that a thief doesn't need to use the stolen goods for there to have been a theft or to be guilty, and then argues that requiring any sort of proof of causation creates some sort of a loophole or a free peak. But this completely overlooks the statutory scheme, and it blurs the distinction between injunctive relief and monetary relief. So what do you think, under Arizona law, Arizona's legislature met when it included royalty as a measure of damage? It seems to me in this case, METI's more or less conceding there's a lack of causation for traditional damages, and they used a different way of valuing what was lost. And to me, it seems, that seems at least sufficiently permissible under Arizona law. So tell me why you don't think that. Well, because the statute, 44-403, whenever talking about different types of damages, always uses the phrase caused by. The causation has to be there. And it's not just the Arizona legislature. This is from the Uniform Trade Secrets Act. And throughout the nation, the Trade Secrets Act is interpreted as an intentional tort, with causation as a necessary element. For damages, not for injunctive relief. Assuming for the sake of argument that these are trade secrets, there's no question they were misappropriated. And then, of course, you have the instruction of responding superior, which the jury was given, and I don't think you challenged. Well, we don't, let me back up a sec. We don't necessarily, we don't concede that all of these items were trade secrets. And the definition of misappropriation, sure, sure. But that analysis also glosses over the use element, which is necessary. There can be a misappropriation, but there can't be any monetary damages without use or disclosure. And that's particularly true with respect to the reasonable royalty measure. It's in the statute again, that the reasonable royalty is for the unauthorized use or disclosure. That the royalty is for the unauthorized use is a license. And so to figure out what is the proper royalty, you need to look at, well, what exactly was taken, and how exactly was it used? You could have a trade secret that's misappropriated by a defendant that could conceivably have been used to create the iPad, but in fact, the misappropriator just sees that it's useful for a novelty keychain flashlight. If you're going to determine the reasonable royalty for that misappropriation, you have to look at the actual use. You can't say, well, they could have done other things with it. And so you have to be able to tie together the trade secret, the use, the harm that was caused by, and the damages. And that's what gets you to the figure. And that takes us to the fourth point on the flawed reasonable royalty analysis. Because Mehdi's expert never did that, never identified exactly what trade secrets he was valuing, or what trade secrets he was valuing, or what trade secrets he was valuing. Which, if you're an appraiser and you're asked to appraise something, you have to identify what it is that you're valuing. Well, it seems at least evident to me in his analysis, he at least was talking about the profit and the GNA figures, right? Yes. I didn't see anything in his testimony that indicated he was relying on the employee roster or the certification. Unless you can point me. Well, I think I can, because when he's asked about this, because he's like a gneel, or trying to pin him down, and every time he's asked, he says, well, I'm just valuing what you've all heard in trial over the past four or five days. I understand that. He says, I bundled them together, I valued everything, I assumed misappropriation, I assumed the trade secrets, and I took my analysis from there. And despite your best efforts at cross-examination, he wouldn't unbundle them, and he said, the analysis might be different if I had to unbundle them, if I recall. That's exactly right. But as I look in the analysis, and this is what I wanted to call your attention to, ask for your response, it doesn't appear to me that he used anything except for the GNA and the profit margin in his calculations. Am I incorrect in that? Given the context that I understand your prior argument that he bundles them together and says he might value differently if they're unbundled. I accept that. But when I look at what he actually did, where did he use the employee roster? I think the answer to that is, look at his expert report, which is in the record, in Volume 2, and what he sees in that report is that he uses the employee roster. And what he says in his report is that we don't know exactly, because this report was before discovery and trial, we don't know exactly what we're dealing with here, but I'm going to assume and take into consideration all of these things, and he makes that report. But then at trial, he never deviates from the report, and what's so telling is the number's the same. The number from the pretrial report before there's been discovery and trial and the analysis is exactly the same that he testifies to at trial without changing it. And so that simply doesn't make any sense, when he says I'm evaluating a dozen trade secrets or all of these different things, and then not to back out. And he admits that he could or should, but never does it. And so it's completely over-inclusive. Well, I take your point on that, but in reading his testimony in the report, I guess what struck me was if, for example, we were to ask him to unbundle the employee roster of the certification, it would be the same thing. It really didn't seem to make any difference in his analysis. What he really focused on were the other two elements that were alleged to be trade secrets. Well, but, you know, that's not what he said, and I think that also raises the question of how can he value the use of those things and come up with the number that he did? I mean, it doesn't make any sense. I don't think that that works at all. By treating them all as a group and admitting that he could and should have severed them out, his testimony becomes worthless. I mean, that's not a proper method, and that's really what we're trying to argue here, is this has nothing to do with the weight of the testimony or the credibility of it. It's that the entire approach is flawed, to come in at the beginning and make all sorts of assumptions about what the trade secrets might be, and then to not change that when you're at the other end of the conveyor belt. What's also telling is that that report values things that admittedly were not trade secrets, but were proprietary information as well. And so, again, the figure is so ridiculously bloated that it can't be tied to any specific trade secret or any specific use of that trade secret. And so that's why it's flawed, and it never should have reached the jury. I'd like to reserve the remainder of my time for rebuttal. Michael Maloney, on behalf of Management and Engineering Technologies International, Inc. Good morning.  I'd like to rebuttal, Mr. Chief Justice, on the point that the counsel raised on the proximate cause issue, and there was some evidence about the proximate cause. Mettey's president, Mr. Johnson, testified, and I think it was acknowledged in Appellant's opening brief, but Mr. Johnson testified that once my trade secrets are taken, I've lost my competitive edge. And I think Judge Rohl referred to that in his ruling on the motion for judgment as a matter of law as well. In fact, that is, in the opening brief at page 46, counsel cites to that, and that's evidence of causation. But there's more, and that should end the issue on causation, but there's more than that. And it comes from Mr. Peterson, and Mr. Peterson testified that when a thief takes and uses someone's trade secrets without paying the license fee, then that's a harm to the owner as well. So what's your best evidence of use? There's tons of use. It was put on the profit margin, the general administrative rate number that were Mettey's numbers, or put on this PowerPoint slide that was presented by Mr. Romeo in virtually his first act for ISS to the capture team, the folks at ISS that were going to go out and try to win the CTNOS contract that Mettey was performing. But nobody got the bid for that, right? Isn't that the one that nobody obtained? That's right. So it was used in the literal sense of use, but where is the financial harm when with this use it didn't do any good? Well, I guess the financial harm is, and that's where you come back to Mr. Peterson's testimony, if you have this suppositions, reasonable royalty negotiation. So basically a license fee is what you're saying. Exactly. I had a question along some of the lines that Judge Thomas's questions were. That is, how is it that an employee roster would constitute a trade secret, and also perhaps the certification status? And this is kind of a two-part question, and if not all of the alleged trade secrets really are trade secrets, what do we do about unbundling the financial harm, the license fee, if you will, for two instead of four trade secrets? Well, number one, I think, and Judge Rohl recognized this, that I think there is a view of it was acceptable for the jury to conclude that the roster and these things were trade secret, because Mr. Johnson explained why they were trade secrets. That that was his, that was a list of his employees with their positions, that that was not a public document, that he wouldn't disclose. Well, that's not a public document, but if somebody, you know, people are not forbidden to say that's where they work. I'm the, you know, IT manager at this company, or I'm the secretary at the front desk, or whatever. I mean, it's not typically what one thinks of as a trade secret. I think that's right, and probably the better argument is it doesn't matter, because that stuff wasn't in Peterson's valuation anyway. Well, except the problem with that is that he then says, as you heard my colloquies, he says, no, I bundled everything together, and if I had to unbundle, my figures might change. That's what his testimony is. Now, that's, it's hard to know what to do with that if we assume that the employee roster is not a trade secret, and that's part of the jury's consideration, and the fact that the certification doesn't seem to me to be a trade secret at all, it's public. So you've got two of the four elements that are likely not trade secrets. He says he values the whole thing. How do we sustain his damage calculation? Well, I think you do, because you have to go back and look at what he specifically said. And what he specifically said is, yeah, he said the things that we talked about, have been talked about or discussed over the last few days, but then he was specific. And he said the GNA numbers, he said the profit margin numbers, and then he said something about the employees listed in that 2004 contract by position and number, and then he said the labor hours. Okay? And that's not the roster. You know what that is? That's, I think it's Exhibit No. 45, and that's a proposal that Mr. Johnson addressed in his direct testimony, and it's a proposal that METI submitted in 2004, and it has, it has the labor hours that METI was proposing in the ongoing contract at the time. Okay. So I'll grant you three. Theft took place. But at least there's one in there, that certification, that's not a trade secret. Well, Peterson didn't say that on, he didn't say, I used the certification. No, what he said was, I used everything that you argued as a trade secret, and that was one of the things you argued as a trade secret. Oh, wouldn't it be permissible? We would submit that it would be permissible for the jury to take those things that he specified were the specifics, and to put the numbers together for those. And counsel keeps harping on the fact that the expert report listed a lot of things. Well, the expert report wasn't in evidence, and the jury didn't see the expert report. And so that sounds like that would have been some decent cross-examination where they could have challenged Mr. Peterson about that and said, well, hey, why did you change from what you said in your expert report to what's now, and that evidence wasn't there. Well, it kind of cuts both ways. The way it cuts for you is you'd say, well, he didn't use those impermissible items. The figure was the same. Or if you look at it the other way, he didn't change. He must have used all these items that didn't unbundle them, and therefore, we know the figure must be lower. I'm not sure which is a better interpretation. Well, that's not an unfair interpretation. I would grant that, Your Honor. But I do think that even all these things, even the roster, if you look at the roster, it contains stuff that's not out there in the jury. It's not in the public domain. It's got information about relationships of Meddy's employees. It tells what the specific positions of Meddy's employees are. And I think there was testimony. We're talking generally the employee roster, and there's two exhibits, Exhibit 45 and Exhibit 52. And 45 is this phone list that Mr. Brown said, oh, you can get it. This is the thing that he wanted to keep close at hand. And, frankly, that sounded to us, and presumably the jury could conclude, that when you say keep this close at hand, there's a reason that you're keeping it close at hand, maybe because it's not a legitimate document that you're supposed to have. Okay. I'm sorry. I didn't mean to interrupt you. But, anyway, that document has the listing of all the people that are working in the CT-NOSC or a lot of people that are working in the CT-NOSC. But then, you know, I guess what's called the employee roster is this other document that we found on the SharePoint server, the ISS secure server. And that's a document where Romeo had gone through, I guess he went through the phone list. We don't know what the genesis of the document was. But it's a list of over 500 names. And there's yellow highlighting on the list. And there's information on the list that says, you know, on number 323, this is a METI employee who's the team lead for this. Could I take you back for a moment to Judge Graber's questioning about what is the harm here, what is the loss? How do we get these damages? And if I understood the way that colloquy came out, you said, well, the loss is in terms of license fees. And I'm having trouble connecting how you would get license fees for some of this information that is being claimed to be a trade secret, like the certification or the roster and the team members. I don't understand that. Well, and that's where it comes down to Mr. Peterson's testimony. And it and Which was? Well, he derived But he said it wasn't very specific, was it? Well, he derived a reasonable royalty. And what he did was he presumed that both parties would sit down and they would negotiate how much they would pay. And so he looked at the things to get the trade secrets, ISS would pay in a range of, and I don't know the numbers, between 900,000 and 3 million, I think was the number. And so he, you know, did a calculation and came up with For the bundled Well, we, I guess my first level of argument, it's primarily for the bidding numbers because you go back to July 2005 and there's this Mr. Brown email. This is the stuff that ISS wanted. They wanted the wrap rate. If you can't get the wrap rate, that's key information. If you can't get the wrap rate, get the labor hours and we can estimate what we need to be. So I think that when it's looked in that context, then really the certification is not what we're talking about. We're talking about the wrap rate. And the parts I understand the wrap rate is G&A and profit and fringe and overhead. And I don't have a PowerPoint slide that says fringe and overhead. But I've got the PowerPoint that's got the two other key pieces. And that's going to be the stuff that's going to enable ISS to figure out how to come up with a price or a cost. It's going to undermine METI's price or cost. And so that's, to me, when it's all looked at in the big picture, what they wanted, what they were doing. Brown didn't, Brown and Myers didn't ask Romeo. We contend that they asked Romeo to get the wrap rate and get the bidding stuff. And that's really what this case is all about. So and on the cross appeal, you know, we would just submit on the briefs on that. Any further questions? No, thank you. Thank you. Thank you. On the causation point, I'd direct the court to the fire trace case that we cited in the reply brief at page 21 to 23 that specifically talks about how misappropriation is not the same as proximate cause. Those are separate elements that need to be proven. On the use point, I would urge the court to look at O2 micro versus monolithic, which we also cited, because in that case talks about how mere possession and discussion of a trade secret is not use. And what happened in that case was that there was also experimentation internally, and that's what hung up the defendant there. But both sides in that case said, well, just having it and talking about it isn't use. Well, isn't it use if it informs a competing bid? Sure, but there's no evidence of that. There's no proof. They were never able to tie any of that discussion to any actual bid, document, paperwork, testimony. I mean, they simply never dug deep enough to connect it. And actually, I don't think they ever could have connected it. The testimony from Meddy's president that, you know, having this information means that he lost his competitive edge, that doesn't prove any harm. I mean, that's more of an opinion than anything else. And it's interesting for Meddy to then, in turn, rely back on Peterson's testimony for that point, for usage and trade secrets, because that wasn't Peterson's role as an expert. His role was to come up with a number, and he was to assume that there was misappropriation and trade secrets and all the rest of it. So he can't use the damages expert to fill in all of the substantive tort elements. It's also clear that Peterson did value the certification point, because in his report he talks about, at page 88, at page 17 of the actual report, 88 in the record, that he's valuing information that makes Meddy look bad. And that, I think, is obviously the certification point. And also, again, shows that he's valuing points that are not really trade secrets. And on the labor valuations that we just heard, that information comes from the thumb drives. And Meddy admits that that information wasn't part of what Peterson used. So, I mean, none of this fits together. It's just simply not there. And what we're left with is a trade secrets case that's missing trade secrets, it's missing use, it's missing causation, and it's got an award that's missing a viable method that can link all of these things together. And that's why the GNA and their profit margin don't constitute trade secrets in this context. I'm sorry? Why don't you think that, I mean, just to talk about the two, why don't you think that the GNA figure and the gross profit, and I understand you've got industry standards that you've cited to. Well, but if you know that somebody's going between 5% and 8% and you bid at 4.9% or 4.8% in a contract and you get the contract as a low bidder, that's valuable information. Possibly. Right. So let me focus on the GNA. Yeah. The only testimony about the use of a GNA was that it's not useful. What you really need is the wrap rate, and GNA is part of that. And so to – Right. It's part of the wrap rate, but it's still a component if you're making a competitive bid that's useful information. And fashioning a bid that's lower than somebody else? Well, actually, the testimony on that was that that's not useful information, that you need more than that. It's a piece, but it's a piece of another valuable piece. It's not a piece that can be used – The question wasn't on use. It was on whether or not, in and of itself, it was a trade secret. Now, it may not be a valuable trade secret, but it seems to me that in a competitive environment where you're having competing bids, that any piece of financial information you have about how the other side is bidding is pretty valuable if you're trying to underbid them. Well, generally, yes, but the definition of the trade secret requires that the information have economic use. And the testimony here was that the G&A rate didn't have economic use. That was not – that came from ISS's witnesses, and it wasn't disputed. So it just doesn't – it doesn't go far enough. You know, it's all too hazy, and that's why this Court needs to reverse this judgment. Thank you. Thank you very much. Thank you both for your presentation today. Interesting case, a lot of issues. And we will take it under submission, and we'll be adjourned for the morning.
judges: Schroeder, Thomas, Graber